IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ISAIAH D. JORDAN,

                Plaintiff,

  v.

HOLLY GUNDERSON, TAMMY STRUMNESS, BARRY DAUGHTRY, MARYAH MARTIN, LYNN DOBBERT, MELISSA MCFARLANE, and KOREEN FRISK,

                Defendants.

OPINION and ORDER

22-cv-692-jdp

---

Plaintiff Isaiah D. Jordan, proceeding without counsel, alleges that he suffers from several painful foot problems and that medical staff at New Lisbon Correctional Institution (NLCI) has deprived him of medical care for those problems, mostly by: (1) denying his requests for a low bunk restriction; and (2) delaying his order for special rocker-bottom shoes. Jordan brings medical care claims under the Eighth Amendment.

The state defendants and defendant Dr. Daughtry move for summary judgment. Dkt. 101 and Dkt. 111. As a whole, the evidence shows that defendants actively responded to Jordan's requests for a low bunk restriction and new rocker-bottom shoes and that, when they denied or discontinued a low bunk restriction, they based those decisions on medical judgment. Although it took Jordan several months to receive satisfactory rocker-bottom shoes, there is no evidence that any defendant caused that delay. I will grant summary judgment to the state defendants and Dr. Daughtry and I will dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed except where noted. Jordan has several painful foot problems, including flat feet, bunions, metatarsalgia, and hallux limitus.

Jordan arrived at NLCI in June 2021. Jordan had rocker-bottom shoes that he had received at Jackson Correctional Institution (JCI). Rocker-bottom shoes have rounded soles that create a rocking effect while walking, which reduces the force of impact.

When Jordan arrived at NLCI, defendants Martin, McFarlane, Frisk, and Dobbert were nurse clinicians, defendant Strumness was the health services manager, and defendant Gunderson was the health services nursing coordinator.[1] Defendant Dr. Daughtry was Jordan's primary care provider. (I infer that Dr. Daughtry provided care under a contract with the Department of Corrections, but the parties do not specifically identify his position.)

In mid-August 2021, Jordan was seen by nondefendant Nurse Payne, who completed a special needs evaluation for a low bunk and submitted it to the Special Needs Committee. At the times material to this case, special needs based on medical necessity were governed by established nursing protocols and Policy and Procedure (P&P) 300:07. As relevant here, the criteria for a low bunk restriction included significant functional limitations in mobility secondary to arthritis or musculoskeletal disorders. Dkt. 104-2 at 9. Payne documented that Jordan had rocker-bottom shoes and could complete multiple physical tasks, including walking for a mile, carrying trays, cleaning his room, climbing stairs, and doing upper-body weightlifting exercises. Dkt. 104-1 at 87. In early October 2021, nondefendant Officer Ball reported to

---

[1] I will refer to these defendants as the state defendants.

Martin that Jordan had wheelchaired a prisoner to the Health Services Unit (HSU) and that he'd never seen him walk in a labored manner. Dkt. 104-1 at 25–26.

That month, Jordan complained about foot pain and that his rocker-bottom shoes were worn. Defendant Dr. Daughtry referred Jordan to an outside podiatrist. Also, on Dr. Daughtry's behalf, Frisk entered an order for Jordan to receive replacement shoes from Winkley Orthotics and Prosthetics, a company that NLCI used to create custom shoes or modify medical shoes. Dkt. 105 ¶ 35; Dkt. 104-1 at 8–9.

Later that month, the Special Needs Committee met to discuss the requests of Jordan and other prisoners for low bunk restrictions, and Martin sat on the committee. The committee denied Jordan's request, documenting that it didn't meet criteria as defined in policy. Dkt. 104-1 at 86.

Jordan continued to complain of foot pain, including while climbing ladders. In mid-November 2021, the HSU received a health services request from Jordan complaining that he had fallen off a ladder while climbing down from the top bunk and that he had injured his knee. Dkt. 132-19 at 1. McFarlane spoke with Dr. Daughtry, who approved a low bunk restriction for six months. Dkt. 104-3 at 5.

In early December 2021, Jordan complained that his rocker-bottom shoes were worn, prompting Martin to contact the medical program assistant associate, nondefendant Hams. Hams told Martin that she needed an order from Dr. Daughtry to replace the shoes, and Martin forwarded the message to him. About a week later, Winkley recorded that it would ship Dr. Comfort shoes to NLCI and noted that they were the same size and style as Jordan's worn rocker-bottom shoes. *See* Dkt. 110-4 at 3.

The podiatrist, nondefendant Dr. Hilbert, saw Jordan a few days later. As relevant here, Dr. Hilbert recommended New Balance tennis shoes, a bottom bunk, and avoiding climbing ladders. Dkt. 104-1 at 68. Dr. Daughtry approved those recommendations in late December 2021. *Id.* at 74. Dr. Daughtry, McFarlane, and Strumness discussed the recommendation, reviewed P&P 300:07, and decided that Jordan could purchase New Balance shoes through the official catalog. *See* Dkt. 104-2 at 8. New Balance shoes are regular shoes that can be purchased through the official catalog.

Jordan refused the Dr. Comfort shoes that Winkley shipped in December 2021 because they didn't have increased rocker bottoms. *See* Dkt. 104-1 at 17, 119. "Increased" evidently meant that the rocker bottoms on the refused shoes weren't as rounded or as effective as the rocker bottoms on the Dr. Comfort shoes from JCI, at least before those shoes had become worn. Jordan then asked about new rocker-bottom shoes. Martin forwarded his request to Hams, who was responsible for coordinating with Winkley for special shoes. In mid-January 2022, Dr. Daughty entered an order for Dr. Comfort shoes.

Jordan continued to ask about the status of that order in February, and he was assured by HSU staff that his request was being worked on. *See* Dkt. 104-1 at 117. Hams asked Winkley to add rocker bottoms to Jordan's shoes and sent them photos of his past rocker-bottom shoes. Dkt. 110-4 at 4. Winkley's records state that on February 9, 2022, Jordan's modified Dr. Comfort shoes were shipped to NLCI. Dkt. 110-4 at 5.

On separate days in February 2022, correctional staff documented that Jordan was seen engaging in multiple physical activities. Dkt. 104-1 at 84–85. Later that month, based on his review of these functional observation forms, Dr. Daughtry discontinued Jordan's low bunk restriction. *Id.* at 84.

In mid-February 2022, the Dr. Comfort shoes shipped on February 9 arrived at NLCI. Winkley told McFarlane that those shoes were rocker bottoms but that they hadn't been modified. Dkt. 105 ¶ 67; Dkt. 104-1 at 16–17; Dkt. 132-19 at 34. Jordan said that the shoes didn't have rocker bottoms, and McFarlane was dissatisfied with them. McFarlane recommended that Jordan take the new shoes and his worn Dr. Comfort shoes from JCI to Dr. Hilbert to see if he could bridge the gap between them. Dr. Daughtry agreed with this plan of care.

In late April 2022, Dr. Hilbert saw Jordan and recommended that rocker bottoms be added to his Dr. Comfort shoes. Jordan visited Winkley in late May 2022 for that purpose, and he ultimately received his modified Dr. Comfort shoes in early June 2022.

On June 23, 2022, Dr. Hilbert saw Jordan, who reported that he was very satisfied with his new rocker-bottom shoes and that they had significantly reduced his foot pain. Dkt. 132-17. Jordan complained of foot pain while walking barefoot or climbing ladders, and Dr. Hilbert recommended that he continue wearing those shoes and that he use a low bunk or padded ladder rungs if assigned to a top bunk. *Id.*; Dkt. 104-1 at 51.

Martin called Dr. Hilbert's office to clarify his recommendation for a low bunk or padded ladder rungs. Dkt. 132-17 at 20. Martin had never seen Dr. Hilbert make such a recommendation. According to Martin, Dr. Hilbert told her that Jordan was physically capable of climbing a ladder. On Martin's request, Dobbert informed Jordan that NLCI would not pad his ladder rungs and that he could wear his new shoes while climbing the ladder and remove them in bed. Dkt. 132-22 at 18.

In early August 2022, the physical therapist, nondefendant Hyzer, evaluated Jordan. Hyzer recommended a low bunk. Hyzer wrote that wearing shoes to climb the ladder would

5

minimize harm to Jordan's feet but compromise cleanliness. Jordan asked the HSU to approve a low bunk based on Hyzer's recommendation. Martin referred the request to Nurse Practitioner Demler, who was Jordan's provider at the time. Dkt. 104-1 at 96. Demler noted that lack of cleanliness wasn't a good enough reason to order a low bunk restriction and asked Jordan to wear his rocker-bottom shoes when climbing the ladder. I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a medical care claim, Jordan must show that he had an objectively serious medical condition that defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). Defendants do not dispute that Jordan's painful foot problems are a serious medical need.

The issue is whether defendants consciously disregarded that need. Conscious disregard requires that defendants are subjectively aware of that need. *See Cesal*, 851 F.3d at 721. That means that defendants know of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they actually draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

The Eighth Amendment entitles prisoners to "adequate medical care," that is, "reasonable measures to meet a substantial risk of serious harm." *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The Eighth Amendment doesn't require "specific care" or "the best care possible." *See id.*; *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

6

Disagreement between defendants and Jordan, or between two medical professionals, about the proper course of treatment isn't enough to show conscious disregard. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). If a medical professional has provided some care for a prisoner's condition, she consciously disregard his serious medical need only if her care is so inadequate that it demonstrates an absence of medical judgment, that is, that no minimally competent professional would have responded in that way in the circumstances. *See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). Jordan must also show that the deprivation of medical care injured him. *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

A.  **October 2021 denial of low bunk restriction**

Jordan proceeds on a claim that, in October 2021, Martin deprived him of medical care by denying his request for a low bunk restriction. The undisputed facts show that Martin based her decision to deny this accommodation on medical judgment.

It's undisputed that the Special Needs Committee had to determine the necessity of a low bunk restriction under P&P 300:07 and that the criteria for a low bunk included significant functional limitations in mobility secondary to arthritis or musculoskeletal disorders. Jordan says that his foot problems met this criterion. But Payne documented in mid-August 2021 that Jordan had rocker-bottom shoes and could complete multiple physical tasks. Similarly, in early October 2021, Ball told Martin that Jordan had wheelchaired a prisoner to the HSU and that he'd never seen Jordan walk in a labored manner. Jordan states that he could complete those physical tasks because he was wearing his rocker-bottom shoes. Dkt. 131 ¶ 27. But it was reasonable for Martin to consider the effect of Jordan's shoes when assessing his level of

7

mobility. In short, the recent reports that Jordan could complete multiple physical tasks gave Martin a basis to conclude that his foot problems weren't significant functional limitations. *See Collins v. Lochard*, No. 11-cv-3086, 2013 WL 84898, at *2–5 (C.D. Ill. Jan. 7, 2013) (prison doctor didn't consciously disregard prisoner's request for a low bunk to relieve, among other ailments, foot pain, in part because of prisoner's high level of physical activity).

Jordan argues that Martin didn't present his full medical history to the Special Needs Committee, thus skewing its decision. But Jordan hasn't identified a requirement for Martin to summarize every document in his medical file at that meeting. The issue is whether Martin used her medical judgment, and the undisputed facts show that she did. *See* Dkt. 104 ¶¶ 62–63; Dkt. 104-1 at 25–26; Dkt. 131 ¶ 27; Dkt. 132-20 at 47. I will grant summary judgment to the state defendants on this claim.

**B. December 2021 rejection of Dr. Hilbert's recommendation for special shoes**

Jordan proceeds on a claim that in, December 2021, McFarlane deprived him of medical care by rejecting Dr. Hilbert's recommendation for special shoes. The undisputed facts refute this claim. Dr. Hilbert's recommendation was for New Balance tennis shoes, not any type of special shoe. Dkt. 110-4 at 68. McFarlane, Strumness, and Dr. Daughtry discussed the recommendation, reviewed P&P 300:07, and decided that Jordan could purchase New Balance shoes through the official catalog. It's undisputed that Jordan could have purchased New Balance shoes through the official catalog. McFarlane didn't reject Dr. Hilbert's recommendation or otherwise stop Jordan from obtaining New Balance shoes. I will grant summary judgment to the state defendants on this claim.

**C. January 2022 delay of order for special shoes**

Jordan proceeds on a claim that, in January 2022, Martin, McFarlane, Frisk, and Gunderson delayed his order for special shoes. The undisputed facts show that Jordan's requests for new rocker-bottom shoes were being addressed and that no defendant was responsible for the delay in his receiving satisfactory shoes.

In January 2022, Jordan submitted several requests for new rocker-bottom shoes after refusing a pair of Dr. Comfort shoes because they didn't have increased rocker bottoms. Martin forwarded two of these requests to Hams, and it's undisputed that she was responsible for coordinating with Winkley for special shoes. Frisk couldn't find an order for rocker-bottom shoes when she responded to Jordan's request, but she advised him to contact intake about replacing his shoes or to purchase New Balance shoes. Dkt. 104-1 at 120. A day later, Dr. Daughtry entered an order for Dr. Comfort shoes. This evidence shows that neither Martin or Frisk disregarded Jordan's concerns about unsatisfactory shoes in January 2022.

Jordan asked about the status of his request for new rocker-bottom shoes in February 2022. McFarlane responded that Hams said that Winkley had already sent his shoes to have the increased rocker bottom added. *See* Dkt. 104-1 at 117. Jordan disputes that Winkley had sent his shoes for that modification. *See* Dkt. 132-3 at 8. Even if this was true, Winkley would be responsible for that result, not any defendant. Similarly, even though the Dr. Comfort shoes that arrived in mid-February didn't have increased rocker bottoms, Winkley would be responsible for that result. McFarlane was dissatisfied with Winkley's efforts to help Jordan, and she suggested that he take his old and new shoes to Dr. Hilbert for more help. No defendant disregarded Jordan's requests for new rocker-bottom shoes in February 2022.

Jordan didn't see Dr. Hilbert until late April 2022, but there is no evidence that any defendant intentionally caused that delay. It's undisputed that delays for appointments with specialists can be as long as six months. Dkt. 105 ¶ 73; Dkt. 131 ¶ 60. Dr. Hilbert recommended that rocker bottoms be added to Jordan's Dr. Comfort shoes, and he visited Winkley one month later for that purpose. There is no evidence that any defendant intentionally caused that delay or consciously disregarded it. Jordan received his modified Dr. Comfort shoes in June 2022, and he was very satisfied with them.

Jordan faults Gunderson for dismissing his related grievance. Dkt. 110-2 at 3. But Jordan hasn't shown that any defendant deprived him of special shoes, so that action would not support liability against Gunderson. I will grant summary judgment to the state defendants on this claim.

## D. February 2022 removal of Jordan's low bunk restriction by Dr. Daughtry and Strumness

Jordan proceeds on a claim that, in February 2022, Dr. Daughtry and Strumness deprived him of medical care by removing his low bunk restriction. Jordan's claim against Dr. Daughtry fails because the undisputed facts show that he based his decision to discontinue the low bunk restriction on medical judgment. There's no basis for liability against Strumness because she's a nurse and, therefore, was entitled to defer to Dr. Daughtry's order to discontinue the low bunk restriction.

It's undisputed that Dr. Daughtry discontinued Jordan's low bunk restriction based on his review of two functional observation forms documenting that Jordan could complete multiple physical tasks, including jogging on a treadmill and walking steadily. Dkt. 104-1 at 84–85. Jordan says that he had only walked briskly on the treadmill, and that

10

he could walk steadily because he had rocker-bottom shoes. Dkt. 131 ¶¶ 10, 27. Even had Jordan only walked briskly, that would support a determination that he had adequate mobility. And it was reasonable for Dr. Daughtry to consider the effect of Jordan's shoes on his mobility. Strumness removed the restriction, but she was entitled to defer to Dr. Daughtry's medical judgment. *Pulera v. Sarzant*, 966 F.3d 540, 553 (7th Cir. 2020).

Jordan suggests that Dr. Daughtry blew him off at his March 7, 2022 follow-up visit, during which Jordan complained about the discontinuance of the low bunk restriction and foot and back pain. *See* Dkt. 131 ¶ 8. But Dr. Daughtry had already discontinued the low bunk restriction by then. Jordan hasn't provided any evidence that his circumstances had changed so much in that short time that Dr. Daughtry's failure to reverse course showed conscious disregard. Jordan says that Dr. Daughtry told him that there was a limited number of low bunks, but it was reasonable for him to consider a resource's availability and other prisoners' needs when deciding whether to issue a low bunk restriction. *See Machicote v. Roethlisberger*, 969 F.3d 822, 827–28 (7th Cir. 2020) ("Administrative convenience can be a permissible factor in a prison's treatment decision . . . ."); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) ("What resources were available is highly relevant because they define the spectrum of choices that officials had at their disposal."). Jordan suggests that Dr. Daughtry disregarded his complaints of pain, but the record of that visit says that he was receiving glucosamine, lidocaine cream, and Tylenol for back and joint pain. Dkt. 115-1 at 3; *see also* Dkt. 131 ¶ 63 (Jordan stating that, in November 2021, he had lidocaine cream and Tylenol). The medical record also states that Dr. Daughtry prescribed a new pain medication, methocarbamol, at that visit. Dkt. 115-1 at 3. The evidence shows that Dr. Daughtry didn't

11

disregard Jordan's complaints of pain. I will grant summary judgment to Dr. Daughtry and the state defendants on this claim.

**E. June 2022 refusal to order a low bunk restriction or padded ladder rungs**

Jordan proceeds on a claim that, in June 2022, Martin, Frisk, and Dobbert deprived him of medical care by refusing to order a low bunk restriction or, alternatively, padded ladder rungs if he was assigned to a top bunk. The undisputed facts show that these defendants were responding to Jordan's concerns and that they based their decisions on medical judgment.

Dr. Hilbert initially recommended a low bunk or padded ladder rungs. It's undisputed that Martin had never seen such a recommendation from him and that she called his clinic to clarify it. Martin says that Dr. Hilbert clarified that Jordan was physically capable of climbing a ladder. Dkt. 104-1 at 13. Jordan doesn't believe that Dr. Hilbert made this statement, but he hasn't provided a foundation for his belief. *See* Dkt. 131 ¶ 40. But, even if Dr. Hilbert didn't say that Jordan could climb a ladder, it's undisputed that Dobbert, on Martin's request, told Jordan that he could wear his new rocker-bottom shoes while climbing the ladder and take them off in bed. Dkt. 132-22 at 18. Jordan was satisfied with those shoes, and there is evidence that he could complete several physical tasks with his prior pair that had worn out. Martin and Dobbert had a basis to conclude that Jordan could climb a ladder while wearing his rocker-bottom shoes. It's undisputed that Dobbert had no other involvement in the denial of this request.

Other considerations show that Martin based her decision to deny a low bunk restriction or padded ladder rungs on medical judgment. Martin told Jordan that padded ladder rungs could rotate and cause him to fall. Dkt. 104-1 at 21. That advice doesn't suggest that she was disregarding a risk that Jordan could fall off the ladder. Jordan says that Martin knew

that he had fallen in November 2021, but that doesn't mean that he would fall again if he were wearing, as Martin advised him, his new rocker-bottom shoes. *See id.*

Jordan says that climbing the ladder in those shoes would be unsanitary because he would have to keep them on his bed, and Hyzer expressed the same opinion. Dkt. 104-1 at 44; Dkt. 131 ¶ 38. But Jordan could have turned his shoes on their sides after removing them and slept with them in the corner of his bed opposite his head. *Cf. Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("[T]he Constitution does not mandate comfortable prisons . . . ."). Jordan's allegation that removing his shoes from his top bunk would cause him severe pain is implausible: he hasn't explained how removing his shoes on a top bunk is meaningfully different from removing them on a low bunk. *See* Dkt. 131 ¶ 8. Jordan's and Hyzer's concern that climbing a ladder in shoes could compromise cleanliness doesn't show that Martin's refusal of his preferred accommodation was medically inappropriate. I will grant summary judgment to the state defendants on this claim.

In response to Jordan's complaint that he needed a low bunk or padded ladder rungs to avoid falling off a ladder again, Frisk advised him to hold onto the ladder while climbing it and noted that Dr. Hilbert said that he could climb a ladder. Dkt. 104-1 at 98. Jordan disputes that Dr. Hilbert made this statement, but that's what his medical chart showed when Frisk answered his request. *Id.*; Dkt. 132-17 at 20; Dkt. 132-22 at 18. Even if Jordan couldn't climb a ladder, there's no evidence that Frisk thought that was true. In any case, Frisk says that she couldn't authorize a low bunk or padded ladder rungs because a provider had to review offsite recommendations, and the evidence Jordan cites doesn't suggest that she could have made that authorization. *See* Dkt. 145 ¶ 109. It's undisputed that Frisk had no further involvement in the denial of this accommodation.

**F. Allegations of violations of prison policies**

Jordan suggests that defendants violated various Department of Corrections policies in handling his requests for new shoes and a low bunk restriction. But, as I explained to Jordan in dismissing his claim that defendants violated DAI Policy 500.302.02, the question under the Eighth Amendment is "whether staff used medical judgment in making medical decisions." Dkt. 8 at 6; *see also Schroeder v. Sawall*, 747 F. App'x 429, 431 (7th Cir. 2019) ("[V]iolation of a prison policy alone does not . . . suggest [conscious disregard]."). Jordan suggests that Martin disliked him because he is black and is a sexual offender. *See* Dkt. 131 ¶ 28. But Jordan hasn't provided a foundation for this belief. *See id.*; *see also McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("[Mere speculation or conjecture will not defeat a summary judgment motion."). The admissible evidence shows that defendants used medical judgment in responding to Jordan's requests for new shoes and a low bunk restriction.

ORDER

IT IS ORDERED that:

1. The state defendants' motion for summary judgment, Dkt. 101, is GRANTED. Plaintiff's claims against the state defendants are DISMISSED with prejudice.

2. Defendant Dr. Daughtry's motion for summary judgment, Dkt. 111, is GRANTED. Plaintiff's claim against Dr. Daughtry is DISMISSED with prejudice.

3. The clerk is directed to enter judgment and send plaintiff copies of this order and the judgment.

Entered July 25, 2024.

                                                  BY THE COURT:

                                                  /s/

                                              _____
                                              JAMES D. PETERSON
                                              District Judge